Izaak D. Schwaiger, SBN 267888
**SCHWAIGER LAW FIRM**
130 Petaluma Avenue, Suite 1A
Sebastopol, CA 95472
Tel. (707) 595-4414
Facsimile: (707) 581-1983
E-mail: izaak@izaakschwaiger.com

John H. Scott, SBN 72578
**SCOTT LAW FIRM**
1388 Sutter Street, Suite 715
San Francisco, California 94109
Telephone: (415) 561-9601
Facsimile: (415) 561-9609
john@scottlawfirm.net

Attorneys for the Plaintiffs MARQUS MARTINEZ
and MICHAELA STAGGS

.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARQUS MARTINEZ, MICHAELA STAGGS, JACOB BECKMAN, DANI BURLISON, and KIMBERLY BARBOSA SOEIRO On behalf of themselves and other similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SANTA ROSA, RAINER "RAY" NAVARRO, MICHAEL PAETZOLD, NICK VERCELLI, JUSTIN MCLEAN, CAMERON ERION, and DOES 1-50<br><br>Defendants. | Case No. 3:20-cv-04135-VC<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

1

2

**INTRODUCTION**

3    1.    On Monday, May 25, 2020, George Floyd was murdered by an officer of the

4    Minneapolis Police Department ("MPD"). The events of Mr. Floyd's arrest and murder were

5    captured on video by multiple bystanders as well as individual officers' body cameras. The

6    videos depicted Mr. Floyd pinned on the street, face down and increasingly unresponsive, and

7    calling out "I can't breathe!" while MPD Officer Derek Chauvin knelt on Mr. Floyd's upper

8    back and neck. Other officers stood by watching Mr. Floyd die without lifting so much as a

9    finger to intervene. All four officers were shortly fired, and Minnesota's Attorney General has

10   levied charges of murder against the perpetrators of this horrible crime.

11   2.    Nationwide protests erupted in response to this brutality and continued largely

12   unabated as violent police responses to protestors nationwide gave rise to new and further

13   demonstrations, which in turn were met with more violence from the police.

14   3.    Santa Rosa's first protest occurred on May 30, 2020. Protests and demonstrations

15   continued through the following months. Thousands of citizens took to the streets in solidarity

16   with the Black Lives Matter movement and have assembled peacefully in downtown Santa Rosa.

17   Incidents of destructive activity from agitators have been notably few.

18   4.    Nonetheless, the Santa Rosa Police Department (and other departments working at

19   their invitation and under their direction) unjustifiably declared these lawful protests "unlawful

20   assemblies" so as to deter further civilian participation in the protests and to set the stage for their

21   illegal use of force. At the direction of the Chief of Police, SRPD shifted almost immediately to

22   the use of violent riot control tactics without regard for the safety and constitutional rights of

23   those assembled. These tactics have included the widespread and indiscriminate use of teargas

24   against nonviolent protestors without audible warning, and the use of less-lethal munitions such

25   as sting ball grenades, pocket grenades, 40 mm projectiles of various application, and rubber

26   bullets in methods which resulted in unjustifiable risk of serious injury (i.e., aiming at protestors'

27   heads).

28   5.    The use of these tactics continued despite clear reports of protestors having been

1

maimed and suffering serious injuries. The Chief of Police has publicly stated that his officers do not aim for the head, but the injuries of protestors speak to the contrary. At best they demonstrate indiscriminate firing into crowds of innocent people; at worst they represent something far more sadistic.

6.      Santa Rosa's Chief of Police, Rainer "Ray" Navarro, has described these as "isolated incidents" yet simultaneously has justified these uses of force by claiming that "my officers were put in great danger," and that the officers "acted with restraint." He has further publicly stated that protestors were "far from peaceful" and that his officers used force "when provoked by protestors." Santa Rosa police spokesperson Lieutenant Jeanene Kucker stated that the less-lethal munitions were used against "individuals or crowds who pose immediate or potential threats. People holding weapons, throwing weapons… If someone chose to be a part of that crowd late Sunday night, they were being dispersed because of their apparent threat to us…" These statements constitute an organized whitewash of the events at issue in this lawsuit, and video evidence of these events exposes each of these claims as a lie. In the meantime, no officers have been placed on administrative leave, no officers have been disciplined, and no police video of the violence has been publically released by SRPD, despite the hospitalization of numerous protestors and the public outcry against the indiscriminate and unnecessary use of such gratuitous violence against civilians assembled in lawful protest.

7.      SRPD's actions, moreover, were in violation of the department's own policy and procedures and/or caused by the omission of needed policies and procedures.

**THE PARTIES**

8.      Plaintiff Marqus Martinez is a resident of Santa Rosa, California. He is a 33-year-old Native American.

9.      Plaintiff Michaela Staggs is a resident of Santa Rosa, California. She is a 20-year old white woman.

10.     Jacob Beckman is a resident of Petaluma, California. He is a 45-year-old white

man.

11.     Dani Burlison is a resident of Santa Rosa, California. She is a 46-year-old white woman.

12.     Kimberly Barbosa Soeiro is a resident of Sebastopol, California. She is a 30-year-old Brazilian woman.

13.     Defendant City of Santa Rosa is a municipal corporation, duly organized and existing under the laws of the State of California, and is the employer of the Chief of Police, Ray Navarro, and the to-be-identified individual officers who carried out the acts and omissions complained of herein.

14.     At all material times, the City of Santa Rosa was responsible for supervising, enacting, and enforcing SRPD's conduct, policies, and practices; the absence of needed policies and practices; and for the hiring, retention, supervision, and training of employees and agents of SRPD.

15.     At all material times herein, Defendant Ray Navarro was employed by Defendant City of Santa Rosa as the Chief of Police and was acting within the course and scope of that employment. He is being sued in his individual and official capacities as Santa Rosa's Chief of Police. At all material times, Chief Navarro was the final policy making official for SRPD, and was ultimately responsible for all policies, procedures or omission of procedures, supervision, and training of SPRD employees. At all material times, Defendant Navarro acted under color of law.

16.     At all material times herein, Defendant Michael Paetzold was employed by Defendant City of Santa Rosa as a police officer, and was acting within the course and scope of that employment, and under color of law.

17.     At all material times herein, Defendant Nick Vercelli was employed by Defendant City of Santa Rosa as a police officer, and was acting within the course and scope of that employment, and under color of law.

18.     At all material times herein, Defendant Justin McLean was employed by Defendant City of Santa Rosa as a police officer, and was acting within the course and scope of

3

that employment, and under color of law.

19.     At all material times herein, Defendant Michael Cameron Erion was employed by Defendant City of Santa Rosa as a police officer, and was acting within the course and scope of that employment, and under color of law.

20.     The true names and capacities, whether individual, corporate, associate or otherwise, of defendants Does 1 through 50 inclusive, are unknown to the plaintiffs, who therefore sue said defendants by such fictitious names. Defendants DOES 1 through 50, and each of them, were responsible in some manner for the injuries and damages alleged herein. Plaintiffs are informed and believe and thereupon allege that each of them is responsible for the injuries and damages alleged herein.

21.     In doing the acts and/or omissions alleged herein, the defendants, including DOES 1 through 50, acted in concert and/or conspired with each of said other defendants herein.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (claims arising under the U.S. Constitution) and § 1343(a)(3) (claims brought to address deprivations, under color of state authority, of rights, privileges, and immunities secured by the U.S. Constitution), and 42 U.S.C. § 1983.

23.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) because defendants are located in the Northern District of California and § 1391(b)(2) because all of the acts and/or omissions complained of herein occurred within the City of Santa Rosa, Sonoma County, California.

## PLAINTIFFS' ALLEGATIONS

24.     The City of Santa Rosa is the county seat for Sonoma County and located approximately 50 miles north of San Francisco and just north of Marin County. In the last twenty years, Sonoma County has seen 93 police-related deaths, including the watershed moment of the

4

shooting of 13-year old Andy Lopez in 2013, which brought police violence to the fore of public debate in Sonoma County's communities, and especially in Santa Rosa.

25.     After the Sonoma County Sheriff's Office, the Santa Rosa PD is the largest law enforcement agency in the county. It has approximately 250 sworn officers and a paramilitary chain of command headed by a chief of police who is appointed by and serves at the pleasure of the city council. Until recently, SRPD employed a full-time police auditor, but following a critical report to the City in 2018, Santa Rosa elected not to renew the auditor's contract, and the position has since been left vacant.

**MARQUS MARTINEZ**

26.     Plaintiff Marqus Martinez (Marqus) is a 33 years-old Native American and a member of the Pomo Indian Tribe. He is a father of five, and a surviving victim of police brutality. On Sunday May 31, 2020, Marqus attended a peaceful demonstration in support of the Black Lives Matter movement in downtown Santa Rosa near the Old Courthouse Square. As the number of peaceful protestors grew, mostly young people in their teens and twenties, so did the number of police officers dressed in riot gear.

27.     While peacefully protesting with others, Marqus took a knee and invited the officers to take a knee with him in solidarity, but received no response from the police. Marqus then moved away from the police line and down the street to the intersection of Mendocino and College Avenues. Shortly thereafter, a team of police in riot gear approached Marqus and a handful of other protestors, some who were dancing in the street, from the opposite side of the intersection and began firing teargas into the peaceful gathering.

28.     Without provocation, Defendant Paetzold threw two tear gas grenades toward Marqus which exploded near him. Marqus began filming the police with his cell phone, calling out that the police were firing on innocent people.

29.     Officer Paetzold identified Marqus as a target, saying to Defendant Vercelli, "Get that guy. He keeps throwing stuff. The red bandana on his face, white sweatshirt." (Marqus was

5

wearing a red bandana and white sweatshirt, and despite every officer on scene being equipped with a body-worn camera, no evidence of Marqus throwing things has been disclosed by the defendants.)

30.     In response, Defendant Vercelli hurled a "tri-chamber" grenade at Marqus. The grenade exploded immediately prior to impacting Marqus' face. The force of the explosion ripped Marqus' face open and drove him to his knees. His phone was destroyed by the grenade's impact. Video of this event was filmed by Marqus and is available at https://youtu.be/eekVT7nJfBU. As Marqus struggled to regain his feet, Defendant Paetzold congratulated Vercelli. "Good throw with that rubber grenade. It's a perfect throw."

31.     Marqus' upper lip was split in three places up to his nose, and his teeth had been broken off and driven into the roof of his mouth. One tooth was broken off and driven all the way through his tongue. His jaw was broken in multiple locations, and he was concussed. A friend drove him to a Santa Rosa hospital as Marqus tried to hold his face together. When he arrived at the hospital he didn't recognize his own face. The hospital was unable to treat wounds of his severity, and transported Marqus to Stanford's emergency department where he immediately underwent extensive surgery. At the time of this filing, Marqus continues to lose teeth and has required further and extensive reconstructive surgery. Photographs of Marqus' injuries are attached as Exhibit 1.

**MICHAELA STAGGS**

32.     Michaela Staggs (Michaela) is twenty years old and lives in the City of Santa Rosa. On the evening of Saturday, May 30, 2020 Michaela, together with two friends, drove to downtown Santa Rosa to attend a Black Lives Matter demonstration. As Michaela and her friends approached Old Courthouse Square in downtown Santa Rosa she observed a large crowd of people peacefully protesting and a line of police in riot gear.

33.     Michaela began to livestream the protest on Facebook from her phone because she believed the people peacefully demonstrating near the vicinity of the police were in danger from the officers. For no apparent reason the police announced the protest was an unlawful assembly

6

and ordered the crowd to disperse. Michaela was concerned about being arrested and retreated down Mendocino Avenue to the corner of Fourth and Mendocino Avenues. Another crowd had gathered in this area and were also surrounded by police in riot gear.

34.     Michaela and her friends again withdrew in fear for their safety to an area near Seventh Street and Mendocino Avenue. The police advanced in phalanx formation, pounding their batons on their shields as they moved forward. They shined flashlights on the cameras of protestors attempting to record their activities, so as to wash out the camera's ability to record. The officers began firing teargas canisters and rubber bullets towards the protestors without provocation. As Michaela watched the line of police approach the intersection, she was shot in the forehead with a hard munition. The force of the impact took her to the ground. Blood began pouring down her face filling her mouth and eyes. Nearby protestors rushed to her aid and wrapped her head in bandages to control the bleeding. Video of this event was filmed by a bystander and is available at https://www.youtube.com/watch?v=gfa-Nta62fw&feature=youtu.be.

35.     Michaela was then taken to a local hospital where she was treated in the emergency department and given three subdermal stitches and ten surface stitches to close the wound. Nine months later, Michaela's injuries are still visible. Bright orange coloration from the munition remains visible under her skin. Michaela suffered dizziness, headaches, and nausea for days following the event, and will likely suffer permanent scarring across her forehead. The City of Santa Rosa has been unable to identify who shot Michaela in the head. Photographs of Michaela's injuries are attached as Exhibit 2.

**JACOB BECKMAN**

36.     Jacob Beckman is a 45 year-old resident of Petaluma. On May 30, 2020, Jacob heard from a friend that a protest was planned in Santa Rosa over the murder of George Flyod. Jacob knew that hundreds of "Reopen Sonoma County" protestors had been gathering at Courthouse Square in Santa Rosa in violation of the County's shelter-in-place order over the last few weekends with little to no police response. Jacob feared for a confrontation between the Reopen crowd and the youth assembling for protest in support of the Black Lives Matter

movement, so he packed a bag with first aid supplies and drove to downtown Santa Rosa.

37.     BLM protestors, many of them children, assembled at the Sonoma County Sheriff's Office in protest of police violence across the nation. After a little more than an hour, the protestors began to disperse. Jacob learned that the Reopen Sonoma County rally downtown had been cancelled, so he left the protestors and made his way home.

38.     A few hours later, Jacob heard that a counter-protestor had driven a pickup truck through a crowd of BLM protestors in downtown Santa Rosa, that police were teargassing protestors, and that the street medics were overwhelmed by the number of youth needing treatment for exposure to the gas. Jacob packed up his supplies again and headed to Courthouse Square in downtown Santa Rosa to assist. When he arrived, he observed a formation of about fifty officers in riot gear. Jacob began to take pictures of the officers, when approximately a half-dozen of them started advancing on his position while another line of officers began advancing on protestors on the north edge of Courthouse Square. The officers approached two protestors seated on the ground. One of the officers kicked a seated protester over. Another shoved a seated woman to the ground.

39.     Jacob approached the officers telling them not to hurt the protestors, putting himself between the officers and the two protestors on the ground with his hands up in the air. Protesters began to call out, "Hands up! Don't shoot!"  Jacob continued to confront the officers, asking if this was what they had signed up for – to gas teenagers in their own community. Jacob asked if this was what the officers thought defending the constitution looked like. As Jacob continued to speak, an officer stepped forward and shoved Jacob back with his baton, knocking him off balance.

40.     The officers then grabbed one of the seated protestors and began dragging him away. Jacob pleaded that the protestors were only there to say that their lives matter. In response, another officer stepped forward and shoved Jacob in the chest with his baton, and then shoved him again. A second officer began shoving Jacob with his baton as well, and he was knocked to the ground. Jacob got to his hands and knees and began crawling away from the line of police

8

when he was grabbed from behind. Officers pulled him toward the line of police and Defendants McLean and Erion began beating Jacob with their batons without any legal justification. Jacob was hit at least one time with a baton strike in his stomach, and suffered multiple strikes to his back and lower extremities. An officer pointed the barrel of a rifle directly at Jacob's crotch. Fearing for his life, Jacob tried again to crawl away, but the officers held him to the ground, wrenching his arms behind his back and cuffing him. Jacob called out that the officers should be fired. An officer drew a knife and cut Jacob's backpack off of his body, and he was hauled away to a police car.

41.     As the protestors called out for people to record the officers' actions, other officers moved to obstruct the cameras' views, purposefully blocking the protestors' ability to record the abuse. Nonetheless, many of these events were captured on cell phone video, while others are documented in police body-worn camera footage.

42.     Jacob was stripped of his belongings (which were never returned) and taken to the Sonoma County jail where he remained for eleven hours. The Sonoma County District Attorney reviewed the officers' reports and body-worn camera footage and determined there was "no indication Beckman committed any crime other than curfew violation." No charges were filed against him. His body was covered in bruises, including marks on his abdomen from being hit with the baton, and he has suffered continuing psychological distress on account of the unprovoked and unjustifiable attack against him.

**DANI BURLISON**

43.     Dani Burlison is a 46 year-old professor at the Santa Rosa Junior College. Her nineteen-year-old daughter was classmates with Andy Lopez, who was shot and killed in Santa Rosa at age 13 by a Sonoma County deputy sheriff in 2013 while walking down the street with a toy gun.

44.     On May 30, 2020, Dani's daughter and her friends joined the protests in Santa Rosa following the murder of George Floyd. They were nervous and afraid of how the police

9

would respond to the protests, so Dani agreed to join them.

45.     At approximately 9:15 p.m., the small group arrived at the bottom of the 101 off-ramp on Davis Street where a crowd had assembled, chanting against a force of Santa Rosa police dressed in riot gear. At some time between 9:30 and 9:45 p.m., the police began firing tear gas canisters into the peacefully assembled crowd without audible warning or provocation. One gas canister landed within feet of where Dani and her daughter were standing, and began filling the air with the chemical agent.

46.     Protestors began choking and screaming as the gas spread through the crowd. Many fled south on Davis Street, but the gas was trapped under the protective masks being worn by protestors in light of the COVID-19 pandemic. Dani began to feel she was suffocating under her mask, and the gas burned her eyes and face. She could not see and became separated from her daughter. A street medic helped irrigated her eyes with saline solution until she could see again, at which point she began helping children in the crowd who were incapacitated by the gas. People all around her were crying and screaming and coughing, and had removed their protective masks to try to breathe. Children were vomiting in the street.

47.     Dani located her daughter whose eyes were badly burned by the gas. They changed out their protective masks for new ones and decided to walk downtown with a group of teenagers between B and Fourth streets. The police were again lined up in riot gear facing north on B Street, and again without provocation began to fire teargas canisters into the crowd. The crowd fled from the police down Fourth Street toward Courthouse Square where they were again confronted by Santa Rosa police in riot gear who again began firing tear gas canisters into the crowd, again without provocation.

48.     In the span of less than two hours, Dani was teargassed three times. The shock of witnessing and being victim of such unjustifiable police violence has caused Ms. Burlison tremendous emotional anguish in addition to the physical effects of the teargas (including chest pain, difficulty breathing, headache, burning eyes, and blurred vision) which lingered for many days. Additionally, Ms. Burlison suffers from an autoimmune disorder that makes her particularly

10

vulnerable to skin irritants. As a result of the teargas attacks, she developed painful skin rashes on her face which took more than a week to heal.

**KIMBERLY BARBOSA SOEIRO**

49.     Kimberly Barbosa Soeiro is a 30 years-old preschool teacher. On May 30th, 2020 she attended the BLM protests in Santa Rosa at Courthouse Square. Owing to Kimberly's profession as a teacher, she is certified in CPR and first aid, so she attended the protests in the role of a street medic.

50.     At around 1:00 p.m., hundreds of people assembled at the Sonoma County Sheriff's Office where speeches were delivered in support of the Black Lives Matter movement. Instead of being met by a representative of the Sheriff's office, deputies with rifles appeared on the roofline. The protestors splintered off taking to the streets in different directions, with a large crowd headed toward Courthouse Square.

51.     The protest was entirely peaceful, with marchers carrying signs and chanting for an end to police brutality. When the crowd approached Third Street, officers in riot gear from the Santa Rosa Police Department appeared marching west toward the assembly. There was no justification for the police to be dressed for a riot, and there was no provocation from the crowd. The presence of the police at this juncture served only to intimidate those assembled, and was designed to instill fear in those wishing to speak out in support of the civil rights of people of color.

52.     At this point Kimberly split off from the crowd to get some food, but continued to watch the protests live on streaming video. As the crowd continued to march toward Courthouse Square, they were met with teargas fired by officers of the Santa Rosa Police Department. Concerned that children might be injured, Kimberly grabbed her medical equipment and rushed toward the confrontation.

53.     Kimberly attended to the protestors most affected by the teargas, as the crowd moved on to B Street. At approximately 9:00 p.m., officers began forming large cordons around

11

the protestors, blocking off Fourth Street and sweeping behind the protestors on Seventh Street. After boxing the protestors in and restricting their movement, Santa Rosa police began firing teargas canisters indiscriminately into the crowd without provocation.

54.     Kimberly was overwhelmed by the clouds of gas as they rolled toward her. Her eyes, nose, and throat began burning and she began to choke. She ran from the gas, washing out her eyes with bottled water as she fled. She found others incapacitated by gas and began rendering them aid.

55.     Shortly it became apparent that SRPD had formed another line to intercept the fleeing protestors. The streets had been blocked off making it impossible for people to return to their cars. Several dozen protestors remained, trying unsuccessfully to leave the scene. The police again opened up with another volley of teargas in Kimberly's immediate area. No warning was given, and no provocation existed for the attack on innocent protestors.

56.     Kimberly was finally able to flee down Fifth Street and return to her car. By the time she was able to leave, she had been subjected to seven different deployments of teargas.

57.     Kimberly returned to the protests the following day, this time with more medical equipment and supplies. To avoid being targeted by the police, she and a group of medical personnel marked their backpacks with large red crosses. The protests were peaceful with youth of all races in the streets shouting, "Hands up! Don't shoot!"

58.     On the next day, June 1st, Kimberly returned to the protests downtown, where riot police had begun assembling barricades around Courthouse Square in anticipation of protestors returning. The protestors marched to the square and each took a knee, silently protesting the murder of George Floyd.  Kimberly received a call that medical personnel were needed at a nearby protest, so she left the scene momentarily and then returned to the main protest at Courthouse Square. As she approached the protest, she could see police firing rubber bullets at protestors. She stayed back in her car to help evacuate injured protesters.

59.     June 2nd was Andy Lopez's birthday. Kimberly assembled with hundreds of protestors near the site of Andy's killing in Roseland, and began marching toward downtown

Santa Rosa. As the marchers approached downtown, lines of riot police emerged from a cross street and blocked the road. The crowd began singing "Happy Birthday, Andy Lopez." Mass arrests ensued, but Kimberly left the scene before she was arrested.

60.     Ms. Barbosa Soeiro attended every protest in Santa Rosa during the months of June and July. During these protests, counter-protestors attacked BLM protestors multiple times each night, with cars and trucks being purposely driven into crowds, and men brandishing guns and knives at protestors. These attacks, often recorded on video, were observed by and/or reported to Santa Rosa Police, yet no arrests were made, just as no arrests had been made of the "Reopen Sonoma County" protestors in the weeks leading up to these events. But more than 100 anti-police brutality protestors were arrested in the first week of BLM protests alone. When Ms. Barbosa Soeiro complained to an officer that a vehicle had driven into a crown of protestors, the officer responded, "Then get the fuck out of the road."

61.     On June 19, 2020, a candlelight vigil was held in downtown Santa Rosa with approximately 150 people in attendance. The attendees organized their own security, with people with flashlights in front of and behind marchers to warn off traffic and guide cars around the protest. At one point a woman driving a white Porsche SUV slowed behind the crowd at the direction of the security personnel, then accelerated directly into and through the crowd of protestors. Three video cameras recorded these events. SRPD was called and provided with the video. Dozens of witnesses made reports, including the license plate number of the vehicle. SRPD made no arrests. In fact, the following day SRPD made a public statement on Nixle with the title "Vehicle Vandalism and Assault during Planned Protest" wherein SRPD claimed that the woman in the vehicle had been attacked by protestors.

62.     This deliberate indifference to the safety of protestors, and official coddling and defense of violent anti-protestors demonstrates that the actions of SRPD against BLM protesters were *not* in response to violations of the law or threats to public safety. They were in response to the content of the message carried by the protestors.

63.     The actions of the Santa Rosa Police further placed every protestor at unnecessary

13

risk for exposure to COVID-19, owing to the excessive, widespread, and unnecessary use of teargas and the effects of that gas on the crowds assembled. Protestors suffered forced coughing and vomiting, and the need to remove all personal protective equipment to escape the effects of the gas.

64.     Plaintiffs further suffered unnecessary pain, trauma, ongoing stress and anxiety, and have been deterred from freely exercising their right to peaceably assemble as a result of defendants' tortious, wrongful, and constitutionally violative conduct.

## MUNICIPAL ALLEGATIONS

65.     The City of Santa Rosa has policies and customs of violating the freedom of expression of persons who protest police brutality, and of using excessive force against such protesters. Nowhere is this more clear than in the widespread, unprovoked use of teargas.

66.     Throughout these protests, hundreds of peaceful protestors who were in no way engaged in violent or destructive behavior were teargassed indiscriminately by Santa Rosa police. These foreseeable constitutional violations were made possible and in fact were authorized and encouraged by SRPD's lack of *any written policy whatsoever* governing, guiding, or limiting the use of tear gas. This lack of written policy resulted in the arbitrary and punitive application of chemical agents against citizens peacefully assembled in lawful protest.

67.     This failure is compounded by the fact that no tracking system exists to determine when, where, why, and how teargas is deployed by Santa Rosa police officers. As such any oversight or review of the deployment of teargas will rely exclusively on records generated by the very officers who fired the tear gas in the first place.

68.     SRPD has no tracking system to determine which officers use less-lethal munitions, or even how many projectiles were expended against protestors. SRPD has a policy which makes the use of less-lethal projectiles potentially anonymous, relying on each officer to self-report when such munitions are used. In the absence of such a report (an entirely foreseeable event in instances of excessive or punitive force) SRPD has no way to track which projectiles

SECOND AMENDED COMPLAINT FOR DAMAGES

were used by which officers under what circumstances. This encourages and leads directly to the indiscriminate use of potentially lethal force against peaceful protestors.

69.     It is entirely foreseeable that police officers acting on their own with no policies to guide them in the face of anti-police protests would deploy teargas punitively against those protestors. Despite this patently obvious risk, SRPD unleashed angry, untrained, overworked, and unbridled officers in riot gear upon peaceful men, women, and children exercising their constitutionally protected rights. These tactics are not used on any protestors save those with a message critical of the police.

70.     The City of Santa Rosa has failed to train and/or has inadequately trained its police officers in the use of teargas and less-lethal projectiles. This is demonstrated in part by the fact that officers are aiming potentially deadly devices at protestors' heads when proper training and policies would instruct that this should never be done. The consequences of this lack of training are plainly obvious. This is further demonstrated by the widespread use of teargas without documentation or accountability in instances that could never justify its deployment.

## CAUSES OF ACTION

### COUNT I:
**[Fourth Amendment/Excessive Force, 42 U.S.C. 1983]**
By Plaintiff Martinez against Defendants Paetzold and Vercelli; by Plaintiff Beckman against Defendants McLean and Erion; and by Plaintiffs Staggs, Burlison, and Barbosa Soerio against Does 1-50.

71.     Plaintiffs restate and re-allege all previous paragraphs of the complaint.

72.     Defendants Paetzold, Vercelli, McLean, Erion, and Does 1-50 violated the Plaintiffs' clearly established rights to be free from excessive and unreasonable force as guaranteed by the Fourth Amendment, and as outlined herein.

73.     Plaintiff Martinez' Fourth Amendment rights were violated when he was deliberately, unjustifiably, and specifically targeted with teargas and grenades by Defendants Paetzold and Vereclli.

74.     Plaintiff Staggs' Fourth Amendment rights were violated when she was

15

deliberately and unjustifiably shot in the face with a 40 mm projectile by an officer that the City, on account of their constitutionally deficient policies and practices, been unable to identify.

75.     Plaintiff Beckman's Fourth Amendment rights were violated when he was deliberately, unjustifiably, and specifically beaten with batons by Defendants McLean and Erion.

76.     Plaintiff Burlison's Fourth Amendment rights were violated when she was deliberately and unjustifiably targeted with teargas by Does 1-50.

77.     Plaintiff Barbosa Soeiro's Fourth Amendment rights were violated when she was deliberately and unjustifiably targeted with teargas by Does 1-50.

78.     An objectively reasonable officer would have known that the use of such excessive and unreasonable force on the Plaintiffs would cause severe pain and suffering.

79.     Defendants Paetzold, Vercelli, McLean, Erion, and Does 1-50 acted willfully, wantonly, maliciously, oppressively and with conscious disregard for the Plaintiffs' rights.

80.     Said Defendants' misconduct caused Plaintiffs to suffer serious injuries and damages, including general, non-economic damages and economic damages to be determined according to proof.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**COUNT II:**
**[*Monell* and Supervisory Liability - Fourth Amendment/Excessive Force, 42 U.S.C. 1983]**
By all plaintiffs against Defendants City of Santa Rosa and Chief Navarro

81.     Plaintiffs restate and re-allege all previous paragraphs of this Complaint.

82.     Plaintiffs were seized when officers intentionally used unreasonable force by way of chemical agents and "less-lethal" projectiles.

83.     Defendants' officers and agents, under color of law, committed these acts without justification or warning, and as a result, these acts were objectively unreasonable and constituted unlawful seizures and excessive force.

84.     Plaintiffs did not pose a threat to any of the defendants' officers, agents or any other person. Plaintiffs did not participate in riotous acts, looting, or the destruction of property.

85.     It was Santa Rosa's custom and policy, as well as their failure to train and

16

supervise their officers and/or issue corrective instructions after violations were brought to the City's attention, that caused the unlawful use of excessive force.

86.     Santa Rosa's failure to supervise and train their employees and agents with respect to the Fourth Amendment rights of Plaintiffs, including a failure to discipline officers for Fourth Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs. The pattern of similar constitutional violations against Plaintiffs that occurred during these protests demonstrates the deliberate indifference of Santa Rosa to the rights of Plaintiffs.

87.     Further, given the pattern and practice of constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that Santa Rosa demonstrated their deliberate indifference to the constitutional rights of Plaintiffs by failing to provide such training and supervision.

88.     Plaintiff Martinez' Fourth Amendment rights were violated when he was deliberately, unjustifiably, and specifically targeted with teargas and grenades by Defendants Paetzold and Vereclli.

89.     Plaintiff Staggs' Fourth Amendment rights were violated when she was deliberately and unjustifiably shot in the face with a 40 mm projectile by an officer that the City, on account of their constitutionally deficient policies and practices, been unable to identify.

90.     Plaintiff Beckman's Fourth Amendment rights were violated when he was deliberately, unjustifiably, and specifically beaten with batons by Defendants McLean and Erion.

91.     Plaintiff Burlison's Fourth Amendment rights were violated when she was deliberately and unjustifiably targeted with teargas by Does 1-50.

92.     Plaintiff Barbosa Soeiro's Fourth Amendment rights were violated when she was deliberately and unjustifiably targeted with teargas by Does 1-50.

93.     As a foreseeable result of the constitutionally deficient policies and practices of the City of Santa Rosa, the Plaintiffs suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

17

1

2

**COUNT III:**
**[*Monell* and Supervisory Liability/Ratification, 42 U.S.C. 1983]**

3

By all Plaintiffs against Defendants City of Santa Rosa and Chief Navarro

4

94.     Plaintiffs restate and re-allege all previous paragraphs of the complaint.

5

95.     The acts of Defendants Paetzold, Vercelli, McLean, Erion, and Does 1-50 deprived

6

Plaintiffs of their rights under the Fourth Amendment to the United States Constitution as

7

outlined above.

8

96.     Defendant Chief Navaro had final policymaking authority from Defendant City of

9

Santa Rosa concerning the acts and/or failures to act of Defendants Paetzold, Vercelli, McLean,

10

Erion, and Does 1-50.

11

97.     Defendants Chief Navaro and the City of Santa Rosa ratified the acts and/or

12

failures to act of Defendants Paetzold, Vercelli, McLean, Erion, and Does 1-50, in that they knew

13

of these defendants' acts and omissions leading to the violations of Plaintiffs' rights, and

14

specifically made a deliberate choice to approve those acts and omissions and the bases for them.

15

98.     The events leading up to and including the above-documented injuries to Plaintiffs

16

were well known to the City and Chief Navarro, and the response from Santa Rosa Police

17

Department was a department-wide response. As such there was no meaningful difference

18

between what Defendants Paetzold, Vercelli, McLean, Erion, and Does 1-50 were doing, and

19

what the department itself was doing under the direction and with the encouragement of the City

20

through Chief Navarro. The acts and omissions of Defendants Paetzold, Vercelli, McLean, Erion,

21

and Does 1-50 occurred in realtime with the Chief's knowledge, encouragement, and consent.

22

99.     If this were not enough, following the events giving rise to this lawsuit, Chief

23

Navarro and his spokesperson reaffirmed the acts and omissions of Defendants Paetzold, Vercelli,

24

McLean, Erion, and Does 1-50 by publically stating "my officers were put in great danger," and

25

that they "acted with restraint." He further publicly stated that protestors were "far from peaceful"

26

and that his officers used force only "when provoked by protestors."

27

100.    At Chief Navarro's direction, Santa Rosa police spokesperson Lieutenant Jeanene

28

Kucker stated that the less-lethal munitions were used against "individuals or crowds who pose

18

immediate or potential threats. People holding weapons, throwing weapons… If someone chose to be a part of that crowd late Sunday night, they were being dispersed because of their apparent threat to us…"

101.    At the time of this filing (nine months since these events took place) no officers have been disciplined, placed on administrative leave, or retrained for any of the acts/omissions alleged herein.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and as representatives of the class defined herein, pray for relief as follows:

1.  An award of general and economic damages compensating Plaintiffs for their injuries, including but not limited to compensatory, pecuniary, and medical expense damages according to proof;

2.  An award of punitive damages against the individual defendants according to proof;

3.  An award of prejudgment interest;

4.  An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

5.  An award of such other and further relief as the Court deems equitable and just.

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues triable.


                                                SCHWAIGER LAW FIRM

Dated:  March 1, 2021                           /s/ Izaak David Schwaiger
                                                Izaak David Schwaiger
                                                Attorney for Plaintiffs


                                                SCOTT LAW FIRM

Dated:  March 1. 2021                           /s/ John Houston Scott
                                                John Houston Scott
                                                Attorney for Plaintiffs

19

# Exhibit 1



# Exhibit 2

